Good morning, Your Honors. My name is Nick Olsaka. I'm here along with my co-counsel, Ashley St. Clair and Matthew Hoxie, and we are students from the University of Arizona College of Law. We are part of the Pro Bono Appellate Project under the supervision of Dr. Willie Jordan Curtis, and we represent the appellant, Lalitha Schagene. I will go over the remote evidence that was submitted at trial. Mr. Hoxie will discuss opening the door and definitive ruling, and we request two to three minutes for Ms. St. Clair to rebut. This appeal involves highly prejudicial evidence that the district court erroneously admitted, distracting the jury from the claims at issue. Ms. Schagene was a hard-working, competent employee at Fiddler's Cove Marina for the Navy who resigned when her employer failed to take corrective action regarding a sexually hostile work environment. Her supervisor even went so far as to isolate her in his truck and expose himself to her, and her coworkers threatened her with harassment as well. Can I just ask, a little cut to the chase on it, on the issue regarding the opening of the door. I won't go to yours. I'll try to separate. But on proximate cause for damages, was the basis for bringing in her mental health treatment back in 98, and the removal of her children, the seizure of her children away from her, was that based upon the idea that she was upset with her current treatment, and would express to her current treater that she was missing her children? Is that what the nexus was for the court? No, Your Honor. There's no indication that she was facing any current stress from losing her children. No, that's not the question. Is that what the court said? Was that how the court let it in? The court viewed her objection to child custody as not a current stressor. The judge even went so far as to say that it's clearly not a current stressor as to Dr. Lazar's testimony, her current treating physician. But the evidence was admitted anyways by the judge. For proximate cause of damages? I can't speak to that, Your Honor. Nothing in the record to say at the basis. Well, here's the situation that I think makes it tricky. That obviously, yes, it's prejudicial, yes, some of it's remote, but your client wants to be compensated for, well, number one, there's a couple, I guess, of primary. She claims that people were calling her names. She claims that a supervisor exposed himself, which he denies. And then she claims an incident where she overheard something where she thinks that there was some sort of plot to rape her, which the other employees said that they completely dispute that. So you have a client that essentially, back in the 90s, was diagnosed with bipolar, has had problems, who then later, even after, what she has is paranoid schizophrenic diagnosis, and I think in her recent treatment, she does mention several times to her psychiatrist that she does loop back. And so she wants to say that everything that happened, number one, she wants to be believed, but she has diseases that affect her ability to perceive reality. I mean that she's got delusional diseases. And then she wants to say that everything is a result of what the employees did to her as opposed to general situation. And you want to present her like she has no mental illness and that there aren't these other things in her life, and how can the other side have a fair trial when that would present her as not the person that she is? Your Honor, we would not like to present Ms. Chagny as she has no mental health issues. We can see that she does have some mental health issues. However, going back so remotely in time to 1987, 1988, unfairly prejudices her because this Court has never held before that going so far, almost 18 years back in time, influences the jury in a positive manner. It provides them any probability that- Well, remoteness is one of the factors you consider. It's not the only one, right? Correct. But isn't there also testimony that these type of mental health things that she has, don't, they don't generally go away. And so it's long term. And so it's to show that when, you know, I mean, it's to go to the issues of when she says her supervisor exposed himself to her, that she could have been suffering from, you know, mental health issues, right? Your Honor, we respectfully disagree. There's no consistent diagnoses from 1997 to 2010 when she saw different physicians. There's no consistency between the two. She went through bipolar in 97, 98, two different diagnoses like schizophrenia. Yeah, so 19, so the current diagnosis that Dr. Lazar testified about was post-traumatic stress disorder. Yes, Your Honor. And one other. What, do you remember what it was? The other diagnoses were post-traumatic stress disorder and then I think- Paranoid schizophrenia? Yes. So that was the two that she was presently having. Correct. The ones she was diagnosed with in 1997 and 98 were, that was the bipolar. And then bipolar one. And, right. And what was the purpose of putting on Dr. Lazar? He was her current treating physician and could attest to how she perceived events. I'm going to go ahead and hand this over to Mr. Hoxie to go further into that, but basically Dr. Lazar was her current treating physician, gave a better picture of her current mental health state at the time of the events of Fiddler's Cove, not so far back to 97, 98, which we think is prejudicial in effect. It was for damages though, right? It was to show that she had declined, right? Declined. The doctor's testimony, what was the purpose of the testimony to say that he was damaged, right? The next person who's responsible for that issue. Okay, I'm going to hand this over to Mr. Hoxie. Sorry. Yeah. This is for Mr. Hoxie to answer that question. May you repeat the question, Your Honors? What was the purpose of putting the doctor on in the first place to discuss her current mental health diagnosis and condition? Your Honors, that was to, to some extent, to discuss her emotional damages that she would have had to obviously claim and show in front of the jury. However, bringing in the remote mental health evidence did not go to, or was not used by Navy to discuss her emotional harm and damages. Those are secondary considerations that the jury was not even allowed to get to because they were confused and distracted as to the issue of her ability to perceive events and her, you know, lurid delusions painting, you know, by the Navy painting Ms. Shagney as a delusional and unfit mother. But what if, but what if I, my delusions interfere with that, you know, you know, obviously the whole, her rape thing that her, that her, that was a little bit, she has no corroboration to that. There's other, there's quite a few other people that say otherwise. What you know, there are people that have delusions that hear things like people are trying to kill them, people are trying to assault them, you know, any number of things. Why isn't, if you have delusions, why shouldn't the jury know that? Your Honors, they should be aware of that information. However, Dr. Lazar correctly testified good and bad to Ms. Shagney's characteristics. Dr. Kalish, we're not arguing that Dr. Kalish could not go into evidence of her current mental state. What we're simply arguing is that the evidence from 97 and 98 is too remote. There was plenty of evidence. So you didn't, you didn't challenge on appeal the issue that your own witness talked about her being delusional in certain ways with the schizo, the paranoid schizophrenia and the current PTSD. You accepted that. What you didn't want is the 1998 information and that she lost her children. Yes, because that is highly prejudicial. I'd like to just briefly say that the pretrial motion does represent a definitive ruling because the pretrial motion was fully briefed, thoroughly argued, and was definitive as to first the evidence relating to her 97 charges in confinement being inadmissible, secondarily evidence of her mental state being admissible. The language from the order saying that, you know, with leave to object to specific questions at trial adds nothing to the substance of that decision, which is that the evidence is admissible. It may always be the case during trial that, you know, evidence otherwise admissible may be ruled inadmissible on other grounds. The same grounds we're challenging on appeal were the grounds of that pretrial motion. Thank you. Thank you. Thank you. Remaining time for rebuttal. Thank you.  Good morning, Your Honors. May it please the Court. Valerie Torres on behalf of the Secretary of the Navy. I want to clarify a few points that were raised on Your Honor's questions. One is dealing with the purpose for which Dr. Lazar's testimony was offered. He offered causation opinions, and so it went to the element of causation. He opined that her emotional distress or her mental health state at that time, that the events at Fiddler's Cove contributed to that. So let me ask about that. So the causation link for the 1998 removal of her children, the only link there was because the doctor said, her treating doctor said, at times she would express sadness that she had her children taken away, right? That's correct. Let me give a little bit more context to that. So the first question that was asked to Dr. Lazar. Paris, were you the trial lawyer too? Yes, I was. You were the trial lawyer. Yes, I was one. My colleague, Diane Schweiner, was also the trial lawyer. Okay, great. He was asked, does she have other stressors in her life? The answer was, yes, she has other stressors. There was a question then, is another stressor that she lost custody of her children? The question- Wasn't that precluded by the court's order? No, it was not, Your Honor. The motion to eliminate did not expressly address any child custody issues. It addressed 1997 charges. I thought it was broad enough to cover the whole incident of the 1997-98, the treatment, everything that went along with it. Right. But the custody issue was not raised. And as far as- Weren't they, the kids taken away because of this conviction? I have no idea if that's true. Your Honor, appellant has tried to make that link. And I understand that she lost custody of her children after those 1997 charges. But there is nothing, and there was nothing introduced to the jury- Wait, didn't she lose them in 1997-98? Actually, I don't know, Your Honor, quite frankly, because that issue was not raised and there was no evidence introduced to the jury to make that claim. I don't want to put more evidence in of something that was so prejudicial. No, but of course, neither did defendant. The secretary did not introduce any evidence that suggested that the lost custody of her children was at any rate related- Well, why did you bring in the lost custody? So it was introduced first as another stressor after Dr. Lazar indicated that she had other stressors. When he said it was not another stressor, there was a sidebar conducted by the trial judge. At that point, we made a proffer and the proffer was as follows. His medical notes of her treating her in the last three and a half years, so 2012 to 2015, had indicated that this was still an issue for her. She had raised this issue and repeatedly mentioned it to him during the course of her treatment. But in order for it to be a stressor that links into the causation of her damages and her emotional state currently, you would have to have it be a current activity that is causing the stress, right? So this occurred eight or nine years before the trial and her sentiment that she's sad that she lost her children is different from saying, I'm battling to get my children back in court and that's a stressor. Or I don't have attorney's fees to pay for an attorney to help my children get back. These are kind of current stressors versus this ancient eight, nine-year-old stressor, right? So I understand, but understood, Your Honor, but she's continuing to talk about it and obviously in the course of her treatment, she's continuing to reference it and in fact, she was referencing it more than she was talking to Dr. Lazar about the alleged events. Let me ask you another question. So bipolar disorder is a very controlled disorder and so when an individual is not in a break, they can operate normally around the world in their jobs, right? So to link back to bipolar disorder to show that it was linked to delusion would need another kind of expert, wouldn't it, in order to do that? That's the first part of my question. And the second part is taking children away, going to the jury has an imprimatur of a court saying you are unfit and so we've taken your children. And so it has a more prejudicial impact than just saying she told me she was upset about her children, but it actually is sending the message to the jury, don't worry, another court's already made a determination, she's not fit. And so that's where the prejudice might come in. So addressing, I think, your first question about whether or not you need another expert, we offer Dr. Kalish, who is a psychiatrist who treats patients and treats them for bipolar disorder. So she had these diagnoses going back to 97-98. Now one of the things, one of the reasons this information was relevant from 97-98 is because we have continuing symptoms. And so while the diagnoses may have changed, we had bipolar disorder, we had paranoid delusional disorder, we had paranoid schizophrenia by the time we get to Dr. Lazar, the symptoms were continuing. And Dr. Kalish talked a little bit about that. She continued to experience delusions, she continued to experience tangential thinking or loose associations, et cetera. Based upon the paranoid schizophrenia, which they entered into willingly, but not based upon bipolar, right? No, she continued to have those delusions. Based upon the bipolar diagnosis in 1998? I don't know if it's based upon it. These are all different kinds of mental diseases. Understood, but as Dr. Kalish testified to, this is a spectrum of illness that have overlapping symptoms. And in the case of Ms. Shadney, she had delusions. That's why he also diagnosed her with paranoid delusion disorder. And the records from 1997-1998 from Dr. Shaddick and Dr. DeFrancesco confirmed that she continued, she had these delusions. She has, they all speak in the same terms. But I just don't see how those, whatever she had in 97-98 and the loss of her children relate in any way to her claims against the Navy. Well, I think they relate in terms of causation, Your Honor. You know, we have- So you're talking damages. You're saying it relates to damages. Both. The damages as well. Because Dr. Lazar- Damages. I mean, causation. That her damages, whatever injuries she had, derived from what happened to her when she was working for the Navy. That's the causation I understand you're talking about, am I right? Right. Dr. Lazar said her emotional distress, her mental health issues were caused in part by the events at the Navy. Well, her psychologist, Dr. Lazar, testified that 25% of her distress, the basis for her seeking emotional distress damages was due to the events that occurred at Fiddler's Cove. He testified that there was an existing condition that worsened. So, your argument, I'm understanding, is that Dr. Lazar opened the door to testimony about her pre-existing mental health state to explore whether the events at Fiddler's Cove contributed to her mental health condition at all. Correct. And whether or not it exacerbated it. Right. So, but why does that allow- I mean, it just seems to me so. It's not just prejudicial. It's, you know, the issue is whether it's unduly prejudicial. Why does that allow the Navy to go all the way back to events of 97 and 98, when she clearly was not treated for this thing and got, you know, had trouble and seemed to have gotten herself into a position where she could actually hold down a job? I mean, what I'm thinking about is that, like, if this kind of evidence is allowed when someone, you know, 20 years later is working somewhere and is subjected, and admittedly has some mental health issues, I mean, admittedly, but she freely testifies about it, I mean, she's not claiming all her problems derived from the incidences that occurred when she was working for the Navy, but it sort of is like those rape and sexual assault cases where, you know, past history of 20 years ago, if you could bring that in for every woman who's claiming that, then no woman can bring one of those cases that had ever suffered some kind of mental illness in the past because it would always be with her. It would be like open season. If you found out someone had a problem 20 years ago, it'd be open season. You could sexually harass them because all this stuff would be allowed in in the trial to diminish, both diminish the credibility, which is what happened here, obviously it went, the jury took it as diminishing her credibility, and to get off the hook for whatever might have happened. I'm not saying it happened. For all we know, you know, maybe it didn't happen, but what makes me unsure about saying that it didn't happen is that this other evidence came in that seems so prejudicial that how could you make a clear determination of whether it happened and whether it caused injury? Your Honor, just one point. We keep talking about this evidence being 20 years old, over a decade old. Let's be clear about the timing. She testified that her sexual harassment started in 2004. So these diagnoses and these delusions, these symptoms, these experiences were diagnosed six to seven years prior to that. Dr. Kalish offered an opinion that this, again, going to the element of causation. Right, but there was no evidence that she was suffering from those conditions in 2004, and there was no evidence she was suffering those conditions when she was being treated by Dr. Lazar. She was suffering other things. She was suffering from delusions, and there is evidence from 2010, which is during the time that she was employed with the Navy, that she's continued to have this treatment for delusions. And so we're talking about a condition and or symptoms that are continuing. Now, I think that's what the Navy would like, for it to be one big blur of mental illness and not actually what was going on in each of these periods of time, because that's how a jury gets confused. Well, you have bookends of treatment, right? You have them on either side, but then you also have some of the things she didn't report when they occurred. Is that correct? That's correct. And then she quit. Right. And the reason for her quitting was not... So they didn't fire her. Right. And the reason for quitting was not the sexual harassment. It was she cited on her resignation form that it was COPD, correct? Right. You have a great argument below, and if you hadn't gotten in all this extraneous information, I would feel confident about this jury's verdict. Well, Your Honor, and that brings me to the harmless error. I think... I believe that the admission of the evidence was proper under the abuse of discretion standard, certainly. But even if you don't agree with that, I think the error was harmless. I think there was sufficient evidence here to support the jury's verdict, and it's more probable than not that they would have reached the same outcome. We have Dr. Lazar's own testimony, so her own witness, saying she is a confused historian, that she suffers from delusions, which means that she has a difficult time distinguishing reality from her imagination. Counsel, you're over your time, but you can go ahead if there's something important you want to tell us, but I'll give the other side the same amount of time. Understood, Your Honor. Thank you very much. Counsel, what do you think about my concern that another court kind of stamps approval on taking away the kids? Do you think that was the highly prejudicial, you know, the overly prejudicial issue? Are you... I'm sorry, can you repeat the question? Right. So, my concern is that it's not just the evidence, but the evidence of taking away children is that there is another court that has to do that, and so there's an order that is essentially sent to the jury saying, she's unfit, she's not well enough to be a mother, and so they follow suit. All right. Okay. Go ahead and do your position. I'm sorry. I apologize. That's all right. You haven't stated your name for the record yet. My name is Ashley St. Clair, and I represent the appellant Lolita Shackney. There are three things that I would like to discuss. First, the child custody evidence was absolutely related to the 1997 charges and issues of confinement that was excluded by the court. We provided a record in the FDR that says that right after 1997 or 1998, her kids were taken away incident to the 1997 charges. So in 1997, what, she threatened a public official? Is that right? Yes. There was, I believe, a phone call that was made to Congressman Bill Bray, and there was a lot of incidents that happened because of that. She was hospitalized because of that, and her children were taken away, and the Navy knew this. The Navy knew that her kids were taken away pursuant to that. It was in the record that Dr. Kalish reviewed that the Navy provided, Dr. Kalish's full records that he relied on for his diagnoses. And so the Navy was aware that child custody was related to the 1997, 1998 charges. Also the main argument that her conditions were ongoing, were chronic, and were lifelong. As this court- But it didn't come in about her threatening the congressman, right? No. Okay. On the issue of whether it was ongoing, chronic, and lifelong, as this court's already discussed, the earlier diagnoses were bipolar. In fact, her first doctor said she didn't have major depressive disorder, and she didn't have schizophrenia. Dr. Dave Francesco. However, Dr. Velasquez in 2010 said she had major depressive disorder, and Dr. Cooke-Lazar in 2012 said she had paranoid schizophrenia. So these diagnoses were not only inconsistent, but they were contradictory, like the Plaintiff and Hodges v. Keynes that we cited to in our brief. Furthermore, there are no records between 1998 and 2012. So although they might have evidence before and they have evidence after, there's certainly no evidence or no records in between to link these illnesses. Furthermore, Dr. Lazar's own testimony says that paranoid schizophrenia is like having a genetic mark for cancer. You go decades without having cancer, and then one day, bam, you have cancer. It's a breakdown or a flare-up. But you're clearly not dealing with a woman here that, I mean, even if you get some of it, you keep some of the evidence out, threatening the congressman, starting back then, and then these, and then she's got, and she has continued mental illness through the time of trial, various diagnoses, and continued in there are things, when these incidents started occurring in what, 2004, she doesn't report them, right? And then when she leaves, she says it's another reason for leaving, right? Correct. She... So, I mean, front and center, the jury has to decide. It's her word against the other people. She doesn't basically have any corroborating evidence of any of the instances, right? Well, there is corroborating evidence that the incidents occurred. Everyone agrees that the... They work together. If you want to say that, I mean, those people work together, that's corroborating, so... With regard to the back rub, or joke, or the raping incident, that incident occurred, and so it's not... Well, no, they don't... The other side does not say that they were talking about her getting raped. Well, of course, it would be... It wouldn't be very... So, it's her... Who corroborates her version of the events that they... Her version of the events. No other co-worker does corroborate that version. Okay. So, whether she can correctly understand what's going on, whether she can correctly remember, whether she can correctly report, and what she supposedly has PTSD from two prior rapes as well, whether that's... It's a recurrent type of thing that, you know, in her mind that, you know, that she sees things as a plot to happen that way. There have been definitely times where her mistrust has been something that has been discussed. The last thing that I wanted to talk about today was the harmless error discussion. These errors clearly were not harmless. When determining evidentiary errors for reversible or for harmless error, this court must find prejudice unless the verdict, more likely than not, was untainted by the verdict. And the... That didn't happen here. The Navy failed to show that these errors were not harmless. They made this trial about anything but the sexual harassment at Fiddler's Cove. They made it about this remote mental health evidence and why they plucked these lurid delusions out of her records from 1997, 1980, because they were memorable, because they were salacious, because they were lurid, because that's what the jurors would remember. And... But you were asking for damages and the jury had to determine what was related to Fiddler's Cove, right?  But these... This wasn't related to Fiddler's Cove. These incidents were 10, 12 years before... But there are traumas in her life. There are traumas in her life. But just as Dr. Lazar testified... So does the law... Doesn't the law say that you have to somehow... You're entitled to say, let's say, if something really tragic happens to someone and then they have an incident at work that also upsets them, isn't the... They're not allowed to go into other things that could be contributing to their emotional state? Absolutely. I mean, you bring that... You call that into question, don't you? I mean, they are absolutely able to go into these other events that could be potential other stressors. But as Dr. Lazar said, it wasn't a present stressor and insofar as her discussing it with her treating physician... Well, so didn't he say that Fiddler's Cove was 25% of her stress? Yes, he did say that. Well, so they're not allowed to go into what the other 75% is? Yes, Your Honor, they could go into it, but not with this highly prejudicial child custody evidence. I understand your argument. Thank you. Thank you. Thank you so much. All right. Thank you, counsel. Thank you to the University of Arizona for coming here and making excellent arguments today. And thank you, counsel. You did an excellent job, too, representing the Navy. And I think this is our third case with students coming up, which is Dominguez versus Sessions.
judges: Wardlaw, Callahan, Kendall